J-A16038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| HEATHER ANN ENOS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARIA BALEGA | : | |
| | : | |
| Appellant | : | No. 1123 WDA 2023 |

Appeal from the Order Entered August 22, 2023
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD-23-00717

BEFORE:  KUNSELMAN, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: OCTOBER 9, 2024**

Maria Balega appeals from the order finding her in indirect criminal contempt for violating a protection from abuse ("PFA") order. Balega argues her conduct was not prohibited by the PFA order and the evidence was insufficient. We affirm.

In April 2023, the trial court entered a final PFA order listing Heather Ann Enos as plaintiff. The order provided that Balega "shall not abuse, stalk, harass, threaten, or attempt or threaten to use physical force against [Enos] or any other protected person in any place where they might be found" and "shall not contact [Enos] . . . either directly or indirectly, by telephone or by any other means, including through third persons." Final PFA Order, 4/3/23,

at 2 (capitalization omitted).[1] Enos is married to Balega's son, Ryan Enos ("Ryan"). Ryan also has a PFA order against his mother, Balega.

The police filed a complaint for indirect criminal contempt alleging Balega had violated the PFA order. The court summarized the testimony presented at the hearing as follows.

> On June 27, 2023, [Enos] and her husband went to [Eat'n] Park. As they were being seated, [Enos] saw [Balega] already seated at a table. [Enos] testified that she turned to her husband and indicated that they were not eating here and need to leave. [Enos] testified that [Balega] started yelling, "Leave, get out of here, go eat somewhere else." [Enos] stated that she promptly left the restaurant and called the police. Upon their arrival, [Enos] told the police what happened in the restaurant as well as her history with [Balega], stating that she did not want to be accused later of something untrue. She testified that the police called the District Attorney's office, and it was after that conversation that the police went into the restaurant and arrested [Balega] for violating the PFA order.
>
> Later that same evening, [Balega] went and filed an emergency PFA against [Enos], which expired. A few days later, [Balega] filed another emergency PFA against [Enos], only this time in Washington[] County, which was dismissed.
>
> [Enos] testified that she did not know that [Balega] would be at the [Eat'n] Park when they arrived. After this encounter and the subsequent efforts of [Balega] to file a PFA against [her], [Enos] and her family stayed in a hotel for a few days because she was concerned for her safety and the safety of her family. Additionally, [Enos] testified to significant attorney fees that she incurred because of [Balega's] PFA filings in Allegheny and Washington County after the . . . complaint was filed by the police.
>
> [Enos] testified to the emotional repercussions this has had in her life, and in addition to the household and financial stress, [Enos] has been attending therapy every other week. [Enos] requested ten days of incarceration, attorney's fees and personal costs

_____

[1] The PFA order listed Enos's minor daughter as a second plaintiff.

associated with the matter, and an extension of the PFA order by one year and no mentioning of [Enos's] child on social media.

Trial Court Opinion, filed 11/30/23, at 2-4 (citations to N.T. omitted).

The court found Balega engaged in conduct prohibited by the PFA order by yelling at Enos "and possibly also her husband" in the restaurant. *Id.* at 7. It further found there was sufficient evidence that Balega "understood the conduct prohibited by the order" and "had the requisite intent to commit the wrongful act." *Id.* The court was not persuaded by Balega's argument that she had not been yelling at Enos, but at Ryan. It found Enos "presented as a very credible witness" and considered that Balega had filed for two PFA orders against Enos following the incident. *Id.* at 7, 8. The court determined, "[Enos's] testimony, and the [complaint] filed by the police who responded in the restaurant, supported the evidence that this was abusive, harassing, and unwarranted conduct that [Enos] should have been protected from under the PFA order." *Id.* at 8. It stated, "There was no rational reason or explanation for [Balega] to yell at [Enos] when they were being seated, except to further engage in abusive and harassing conduct." *Id.* at 7.[2]

The court fined Balega $500 and extended the PFA order for an additional year from its previous expiration date. Balega appealed.

---

[2] At the same hearing, the court heard testimony on a separate complaint for indirect criminal contempt that Enos filed against Balega, alleging Balega violated the PFA order through social media posting. The court dismissed that complaint.

Balega raises the following issues:

1. Whether the act attributed to [Balega] – *i.e.*, yelling "Leave, get out of here, go eat somewhere else" – was prohibited by the final PFA order?

2. If the act described in Question 1 was conduct prohibited by the final PFA order, then was there insufficient evidence to prove, beyond a reasonable doubt, that [Balega]'s conduct was directed at [Enos] in light of [Enos]'s concessions that [Balega] "could have" been yelling at [Balega]'s son?

3. Was there insufficient evidence to prove beyond a reasonable doubt the requisite *mens rea* for indirect criminal contempt, *i.e.*, that [Balega] had a "wrongful intent" in her action?

Balega's Br. at 5 (trial court answers and suggested answers omitted).

Balega argues that the PFA order did not prohibit her from yelling at Enos to leave when Enos entered the restaurant. Balega contends that instructing Enos to leave the restaurant does not meet the statutory or dictionary definitions of "abuse," "stalk," "harass," or "threaten," which are the forms of conduct expressly prohibited by the PFA order.

She further argues that while her words could be considered a form of "contact" with Enos, which is also prohibited by the PFA order, the testimony did not establish that she was yelling at Enos rather than Ryan. Balega asserts that Enos admitted that Balega "could have" been yelling at Ryan, as Balega did not address Enos by name. **Id.** at 27 (quoting N.T., 8/21/23, at 55).[3] She

_____

[3] The relevant testimony was as follows:

*(Footnote Continued Next Page)*

also points out that this encounter occurred directly after a magistrate proceeding wherein Ryan was charged with damaging Balega's property.

Finally, Balega argues the court should have considered the context surrounding the encounter when determining whether the evidence was sufficient to prove beyond a reasonable doubt that she acted with wrongful intent. *See id.* at 31-35 (citing *Commonwealth v. Haigh*, 874 A.2d 1174 (Pa.Super. 2005). She asserts she "was caught off guard to find her son and Enos come into the same [Eat'n] Park as Balega after having just left her son's preliminary hearing, where [she] was the victim of her son's act of criminal mischief." *Id.* at 34. Given this context, Balega argues her actions were spontaneous and "did not evidence an intention purposefully setting out to violate the Final PFA Order[.]" *Id.*

PFA orders are enforced by prosecution for indirect criminal contempt. *See* 23 Pa.C.S.A. § 6114; *Commonwealth v. Bartic*, 303 A.3d 124, 131 (Pa.Super. 2023). To prove indirect criminal contempt, the Commonwealth must present evidence sufficient to establish that "the court's order was

---

Q. Okay. And to your knowledge, could she have just been yelling at your husband since your husband was a defendant in a case that she was the victim to?

A. She could have, but there's the PFA against her as well from my husband, so she shouldn't be doing that either, but --

Q. But she did not yell, "Heather, leave," did she?

A. She did not say, "Heather, leave," no.

N.T. at 55.

definite, clear, specific, and leaving no doubt in the person to whom it was addressed of the conduct prohibited; the contemnor had notice of the order; the act constituting the violation was volitional; and the contemnor acted with wrongful intent." ***Commonwealth v. McMullen***, 961 A.2d 842, 849 (Pa. 2008). Whether the defendant acted with wrongful intent should be determined using common sense and considering the context. ***Commonwealth v. Reese***, 156 A.3d 1250, 1258 (Pa.Super. 2017).

Our review of the sufficiency of the evidence supporting a conviction for indirect criminal contempt requires the following.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Smith***, 288 A.3d 126, 131 (Pa.Super. 2022) (citation omitted).

The evidence here was sufficient to support the conviction. Balega concedes that the PFA order clearly prohibited her from speaking to Enos and does not argue that she lacked notice of the order. Thus, the only questions remaining are whether the evidence was sufficient to prove that she did, in fact, address Enos, and whether she did so with wrongful intent.

Enos testified that before she encountered Balega at the Eat'n Park, when the parties were at the magistrate for Ryan's criminal proceeding,[4] Balega made remarks about Enos — not Ryan — which required the police to instruct Enos and Ryan to wait in a separate lobby. **See** N.T. 27-28. Enos then testified that when she and Ryan happened upon Balega in the Eat'n Park, Balega started yelling, "Leave, get out of here, go eat somewhere else," before Ryan even saw Balega or knew that she was there. **Id.** at 29-30. Enos also explained that based on this incident, Balega filed for a PFA against her in two different jurisdictions. **Id.** at 30-34. This context was sufficient to enable the fact-finder to conclude, beyond a reasonable doubt, that Balega was yelling at Enos to leave the restaurant — not just Ryan.

The evidence was also sufficient to establish that Balega acted with wrongful intent. Enos testified that the parties live in the same area and the restaurant was close to the magistrate. **Id.** at 31-32. The PFA order prohibited Balega from contacting Enos, which included speaking to her, despite the possibility that she might unexpectedly encounter Enos in a public space in their neighborhood. Given this context, the evidence was sufficient to enable the trial court to conclude Balega's belligerent response to encountering Enos in a local restaurant was born of wrongful intent, rather than an uncontrollable spontaneous reaction.

---

[4] Enos testified that the parties had been at the magistrate because Ryan was charged with breaking the windows on Balega's car and home, to which Ryan admitted and later pleaded guilty. N.T. at 26.

Balega's reliance on **Haigh** is misplaced. There, we found that the defendant did not intentionally violate a PFA prohibiting contact with his wife when he addressed her during a court proceeding. 874 A.2d at 1178. He was shackled at the time and asked about her diagnosis. **Id.** at 1177. Here, in contrast, the evidence did not suggest that Balega was merely engaging in pleasantries such that it did not support an inference of wrongful intent. It was sufficient to establish that Balega understood she was not permitted to address Enos at the public restaurant and acted with wrongful intent when she yelled at her across the restaurant.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/9/2024